**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

THE STATE OF MISSOURI, et al.,

     Plaintiffs,

v.

U.S. FOOD AND DRUG ADMINISTRATION, et al.,

     Defendants.

Case No. 4:25-cv-01580-CMS

**AMICI CURIAE STATES OF NEBRASKA, ALABAMA, ARKANSAS, GEORGIA, INDIANA, IOWA, LOUISIANA, MISSISSIPPI, MONTANA, NORTH DAKOTA, OHIO, OKLAHOMA, SOUTH CAROLINA, SOUTH DA-KOTA, TEXAS, UTAH, AND WYOMING IN OPPOSITION TO DEFEND-ANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

INTRODUCTION & INTEREST OF AMICI CURIAE ....................................9

ARGUMENT ................................................................................................12

    I.   The Intervenor States Have Standing to Challenge FDA's Actions...12

        A.  FDA's actions harm the Intervenor States' sovereign interest in enforcing their own laws................................................................13

           B.  FDA's actions impose a pocketbook injury on the Intervenor States. ................................................................................21

CONCLUSION.............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alden v. Maine,*
   527 U.S. 706 (1999)..................................................................................13

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
   458 U.S. 592 (1982)............................................................................. 13, 17

*All. for Hippocratic Medicine v. FDA,*
   2023 WL 2913725 (5th Cir. Apr. 12, 2023)...............................................21

*Biden v. Nebraska,*
   600 U.S. 477 (2023)..................................................................................13

*Bond v. United States,*
   564 U.S. 211 (2011)..................................................................................12

*Bost v. Ill. State Bd. of Elecs.,*
   607 U.S. ---, 146 S. Ct. 513 (2026)........................................... 11, 18, 21, 23

*Brown v. Fletcher's Estate,*
   210 U.S. 82 (1908)....................................................................................15

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos,*
   344 F. Supp. 3d 158 (D.D.C. 2018).........................................................18

*Cameron v. EMW Women's Surgical Ctr., PSC,*
   595 U.S. 267 (2022)......................................................................... 13, 14, 17

*Carroll v. Lanza,*
   349 U.S. 408 (1955)..................................................................................16

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.,*
   766 F.2d 228 (6th Cir. 1985)....................................................................14

*City of Arlington v. FCC,*
   569 U.S. 290 (2013)..................................................................................11

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013)..................................................................................17

*Diamond Alternative Energy, LLC v. EPA,*
606 U.S. 100 (2025) ................................................................ 18, 19, 23, 24

*Dobbs v. Jackson Women's Health Org.,*
597 U.S. 215 (2022) ................................................................ 9, 14, 15, 20

*FDA v. All. for Hippocratic Medicine,*
602 U.S. 367 (2023) ................................................................ 22, 23

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ................................................................15

*GenBioPro, Inc. v. Raynes,*
144 F.4th 258 (4th Cir. 2025) ................................................................13

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ................................................................16

*Hughes v. Fetter,*
341 U.S. 609 (1951) ................................................................16

*Maine v. Taylor,*
477 U.S. 131 (1986) ................................................................ 14, 17

*Maryland v. King,*
567 U.S. 1301 (2012) ................................................................18

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) ................................................................14

*Metropolitan Life Ins. Co. v. Massachusetts,*
471 U.S. 724 (1985) ................................................................14

*Mirabelli v. Bonta,*
146 S. Ct. 797 (2026) ................................................................ 20, 23

*Monsanto Co. v. Geertson Seed Farm,*
561 U.S. 139 (2010) ................................................................ 17, 23

*Nat'l Pork Producers Council v. Ross,*
598 U.S. 356 (2023) ................................................................ 12, 15, 16

*New York v. New Jersey,*
598 U.S. 218 (2023) ................................................................14

4

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
  554 U.S. 269 (2008) ......................................................................................22

*Tennessee v. U.S. Dep't of Educ.*,
  615 F. Supp. 3d 807 (E.D. Tenn. 2022) ......................................................17

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) .......................................................................22

*Toomer v. Witsell*,
  334 U.S. 385 (1948) ......................................................................................16

*Trump v. CASA, Inc.*,
  606 U.S. 861 (2025) ......................................................................................18

*United States v. Texas*,
  599 U.S. 670 (2023) ......................................................................................19

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ......................................................................................15

*Uzuegbunam v. Preczewski*,
  592 U.S. 279 (2021) ......................................................................................22

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ......................................................................................15

## Constitutions & Statutes

U.S. Const. art. IV, § 1 ....................................................................................14

U.S. Const. art. IV, § 2 ....................................................................................14

Ala. Code § 26-23E-7 .........................................................................................9

Ala. Code § 26-23H-4 .........................................................................................9

Ark. Code Ann. § 5-61-304 ................................................................................9

Ark. Code Ann. § 20-16-1504 ...........................................................................9

Ga. Code Ann. § 16-12-140 ...............................................................................9

Ga. Code Ann. § 16-12-141 ...............................................................................9

Ind. Code § 16-18-2-1 ............................................................................................9

Ind. Code § 16-34-2-1 ............................................................................................9

Iowa Code § 146C.2 ...............................................................................................9

Iowa Code § 146E.2 ...............................................................................................9

La. Stat. Ann. § 14:87.7 .........................................................................................9

La. Stat. Ann. § 40:1061 ........................................................................................9

Miss. Code Ann. § 41-41-34.1 ...............................................................................9

Miss. Code Ann. § 41-41-45 ..................................................................................9

2026 Miss. Laws, H.B. 1613 (Mar. 31, 2026)........................................................9

Mont. Code Ann. § 50-20-109 ...............................................................................9

Mont. Code Ann. § 50-20-704 ...............................................................................9

Mo. Rev. Stat. § 188.021 ......................................................................................12

Neb. Rev. Stat. § 28-3,106 .....................................................................................9

Neb. Rev. Stat. § 28-325 ......................................................................................20

Neb. Rev. Stat. § 28-335 ..................................................................................9, 20

Neb. Rev. Stat. § 71-6915 .................................................................................9, 20

N.D. Cent. Code Ann. § 12.1-19.1-02 ...................................................................9

N.D. Cent. Code Ann. § 14-02.1-03.5 ...................................................................9

Okla. Stat. tit. 21, § 861..........................................................................................9

Okla. Stat. tit. 63, § 1-731.4 ..................................................................................9

S.C. Code Ann. § 44-41-630 ..................................................................................9

S.D. Codified Laws § 22-17-5.1 ............................................................................9

2026 S.D. Sess. Laws, H.B. 1274 (Mar. 30, 2026) ...............................................9

Tex. Health & Safety Code § 170A.002 .................................................................9

Tex. Health & Safety Code § 171.063 ...................................................................9

Tex. Health & Safety Code § 171A.051 .................................................................9

Utah Code Ann. § 76-7a-201 .................................................................................9

Utah Code Ann. § 76-7-302 ...................................................................................9

Utah Code Ann. § 76-7-332 ...................................................................................9

Wyo. Stat. Ann. § 35-6-123 ...................................................................................9

Wyo. Stat. Ann. § 35-6-139 ...................................................................................9

**Other Authorities**

Society of Family Planning, *#WeCount Report, April 2022 to June
2025* (Dec. 9, 2025), https://perma.cc/Z765-EUXB ............................... 10, 20

Antonin Scalia, *The Doctrine of Standing as an Essential Element
of the Separation of Powers*, 17 Suffolk U. L. Rev. 881 (1983) ...................11

Letter from 17 Attorneys General to the Senate Committee on
Health, Education, Labor and Pensions (Jan. 13, 2026),
https://perma.cc/RY5H-B53G ........................................................................10

John Locke, *The Second Treatise of Government* ...............................................18

Rachel Bluth, *Louisiana wants a California doctor extradited to
face abortion charges. Newsome isn't having it.*,Politico (Jan.
14, 2026), https://perma.cc/3Y8M-Z4G5 .......................................................12

President Biden to Sign Executive Order Protecting Access to
Reproductive Health Care Services (July 8, 2022),
https://perma.cc/9VML-4YCA ........................................................................10

Sabrina Tavernise, *New F.D.A. Guidelines Ease Access to
Abortion Pill*, New York Times (March 30, 2016) ........................................10

Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in
American Federalism*, 150 U. Pa. L. Rev. 973, 975 (2002) ..........................14

Jonathan Adler, *Could Congress Prohibit Abortion if Roe
     Overturned (Updated)*, The Volokh Conspiracy (June 2, 2022),
     https://perma.cc/R9LZ-HL64 .................................................................................15

## INTRODUCTION & INTEREST OF AMICI CURIAE

States have always had a "legitimate interest[]" in protecting unborn life. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 301 (2022). For nearly fifty years, however, States were stymied in how they could pursue that interest. That changed in 2022, when the Supreme Court "return[ed] the issue of abortion to the people's elected representatives." *Id.* at 232. After *Dobbs*, States can now enact and enforce laws that regulate or restrict the availability of abortion "based on their belief that abortion destroys an 'unborn human being.'" *Id.* at 256.

Amici States Nebraska, Alabama, Arkansas, Georgia, Indiana, Iowa, Louisiana, Mississippi, Montana, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, and Wyoming have adopted such laws[1]—including laws that regulate chemical abortion.[2]  These laws represent the considered judgments of "the people and their elected representatives" after hard-fought democratic deliberation. *Dobbs*, 597 U.S. at 259.

Rather than respect these States' prerogatives to protect prenatal life, the federal government—and in particular, the Clinton, Obama, and Biden Administrations—has sought to undermine them. The Clinton Administration's initial approval

---

[1] *See* Neb. Rev. Stat. §§ 71-6915, 28-3,106; Ala. Code § 26-23H-4; Ark. Code Ann. § 5-61-304; Ga. Code Ann. § 16-12-141; Ind. Code § 16-34-2-1; Iowa Code §§ 146C.2, 146E.2; La. Stat. Ann. § 14:87.7; Miss. Code Ann. §§ 41-41-34.1, 41-41-45; Mont. Code Ann. § 50-20-109; N.D. Cent. Code Ann. § 12.1-19.1-02; Okla. Stat. tit. 63, § 1-731.4; S.C. Code Ann. § 44-41-630; S.D. Codified Laws § 22-17-5.1; Tex. Health & Safety Code § 170A.002; Utah Code Ann. §§ 76-7a-201, 76-7-302; Wyo. Stat. Ann. § 35-6-123.

[2] Neb. Rev. Stat. § 28-335; Ala. Code § 26-23E-7; Ark. Code Ann. § 20-16-1504; Ga. Code Ann. § 16-12-140; Ind. Code §§ 16-18-2-1, 16-34-2-1(a)(1); La. Stat. Ann. § 40:1061; 2026 Miss. Laws, H.B. 1613 (Mar. 31, 2026); Mont. Code Ann. § 50-20-704; N.D. Cent. Code Ann. § 14-02.1-03.5; Okla. Stat. tit. 21, § 861; 2026 S.D. Sess. Laws, H.B. 1274 (Mar. 30, 2026); Tex. Health & Safety Code §§ 171.063, 171A.051; Utah Code Ann. § 76-7-332; Wyo. Stat. Ann. § 35-6-139.

of the chemical abortion drug mifepristone was irregular at best. In 2016, the Obama Administration significantly "relaxed" mifepristone's regulatory regime, removing critical guardrails necessary for the drug's safe use.[3] Then, shortly after the Supreme Court decided *Dobbs*, President Biden avowed to ensure that abortion drugs were "as widely accessible as possible," a pledge that emphasized expanding access to mifepristone prescribed via telehealth and then shipped across State lines.[4] Following up on that pledge, in 2023 the Food and Drug Administration (FDA) promulgated a Risk Evaluation and Mitigation Strategy (REMS) to govern mifepristone that removed a long-standing requirement that mifepristone be dispensed in-person and allowed the drug to be prescribed via telehealth. Even though States—like Nebraska—require a prescribing doctor to be physically present, doctors in California and New York (or any other pro-abortion jurisdiction) can now prescribe mifepristone through telehealth under the 2023 REMS, and they are doing so without fear of consequences for breaking other States' laws.[5]

As both the original plaintiffs' and Intervenor States'[6] complaints detail at

---

[3] *See* Sabrina Tavernise, *New F.D.A. Guidelines Ease Access to Abortion Pill*, New York Times (March 30, 2016), https://perma.cc/ASE5-W8MR.

[4] *See* Fact Sheet: President Biden to Sign Executive Order Protecting Access to Reproductive Health Care Services (July 8, 2022), https://perma.cc/9VML-4YCA.

[5] *See* Society of Family Planning, *#WeCount report, April 2022 to June 2025* (Dec. 9, 2025), https://perma.cc/Z765-EUXB (noting that telehealth abortions have "continued to increase" and that "[s]hield laws continue to facilitate abortion access"); Letter from 17 Attorneys General to the Senate Committee on Health, Education, Labor and Pensions (Jan. 13, 2026), https://perma.cc/RY5H-B53G (describing how shield-state residents are "mailing abortion drugs" to women in States where abortion is tightly regulated and usually illegal).

[6] For convenience, this brief sometimes refers to the Intervenor States (Missouri, Kansas, and Idaho) collectively as "Missouri," the leading State plaintiff.

length, FDA's initial approval of mifepristone was flawed. *See* Compl. ¶¶ 50–54, 141–75 (ECF 1); Intervenor States Compl. ¶¶ 3–14, 20, 26–27, 71–158, 200–216 ("State Compl.") (ECF 176). And the succession of actions that have followed, culminating in the current regime of effectively unfettered nationwide access to chemical abortifacients, has exacerbated the harm inflicted on the amici States and our citizens.

At bottom, these federal missteps and misadventures represent an attack on state sovereignty. But the Constitution does not give the federal government power over "every nook and cranny of daily life." *City of Arlington v. FCC*, 569 U.S. 290, 315 (2013) (Roberts, C.J., dissenting). Nor does our federalism condone some States exporting and imposing their internal policy preferences on others. The federal actions that the Intervenor States challenge permit pro-abortion States like New York and California to set nationwide policy, effectively overriding the contrary policies of States like Missouri and Nebraska and nullifying the democratic decision of the latters' citizens. The Constitution promises more. The Intervenor States have suffered concrete harms and thus have standing to challenge these unlawful federal actions.

11

## ARGUMENT

### I.   The Intervenor States Have Standing to Challenge FDA's Actions.

To have standing, Missouri must "be able to answer a basic question: 'What's it to you?'" *Bost v. Ill. State Bd. of Elecs.*, 607 U.S. ---, 146 S. Ct. 513, 519 (2026) (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)). Missouri has "an obvious answer." *Id.* Through the democratic process, the people of Missouri have enacted a limitation on chemical abortions: "the initial dose of the drug or chemical [that induces an abortion] shall be administered in the same room and in the physical presence of the physician who prescribed, dispensed, or otherwise provided the drug or chemical to the patient." Mo. Rev. Stat. § 188.021(1). Yet the current constellation of federal approval and actions, culminating in the 2023 REMS, directly undermines this duly enacted law. In short, FDA permits out-of-state doctors to do exactly what Missouri law expressly forbids. And, as Missouri and other States with similar laws have learned, bringing out-of-state doctors who openly defy their laws to justice has not been easy.[7]

FDA's flawed approval and related actions effectively privilege the policy preferences of some States (those that favor abortion and access to chemical abortion-inducing drugs) over and against those of others (like Missouri and the amici States) whose citizens have adopted a contrary view. The genius of our system of federalism

---

[7] Louisiana, for example, been stymied in its efforts to hold a California doctor responsible for mailing abortion-inducing drugs to Louisiana residents. *See* Rachel Bluth, *Louisiana Wants a California Doctor Extradited to Face Abortion Charges. Newsome Isn't Having It.*, Politico (Jan. 14, 2026), https://perma.cc/3Y8M-Z4G5.

is that it allows for differing views and approaches on important policy questions. *See Bond v. United States*, 564 U.S. 211, 221–22 (2011). What it does *not* allow is for a select few States—no matter how populous or economically significant—to impose their policy preferences on all others. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 406–07 (2023) (Kavanaugh, J. concurring in part, dissenting in part) (one State's attempt to "unilaterally impose its moral and policy preferences … on the rest of the Nation … undermines federalism and the authority" of other States). California and New York have no license to establish abortion policy for the entire Nation. Yet that's exactly what FDA's actions (culminating in the 2023 REMS) have accomplished. FDA has thereby inflicted a definite sovereign injury on States, such as Missouri (and the amici States), that have charted a different path.

That sovereign injury is enough to confer standing. But even if it were not, Missouri would *still* have standing, because FDA's actions have a discrete and directly traceable economic impact—increased Medicaid expenditures—that bear on Missouri's treasury. Pocketbook injuries of this sort confer standing to the affected State. *See, e.g., Biden v. Nebraska*, 600 U.S. 477, 489–90 (2023).

Both harms, sovereign and financial, establish the Intervenor States' standing.

## A.    FDA's actions harm the Intervenor States' sovereign interest in enforcing their own laws.

Our federalist system "preserves the sovereign status of the States," *Alden v. Maine*, 527 U.S. 706, 714 (1999), and reserves to each State "numerous and indefinite" powers within its jurisdiction, The Federalist No. 45. At a minimum, that power includes the ability "to create and enforce a legal code." *Tex. Office of Pub. Util.*

13

*Counsel v. FCC,* 183 F.3d 393, 449 (5th Cir.1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601–02 (1982)). "*Paramount* among the States' retained sovereign powers is the power to enact and enforce any laws that do not conflict with federal law."[8] *Cameron v. EMW Women's Surgical Ctr., PSC*, 595 U.S. 267, 277 (2022) (emphasis added). And there is nigh-universal agreement that a State's enforcement authority includes the power to "punish extraterritorial actions that have tangible impacts on the territory over which they are sovereign." Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*, 150 U. Pa. L. Rev. 973, 975 (2002) (noting that a "a shot fired across the border" from one State into another is a classic example where the latter's "exercise of … criminal authority" over extraterritorial conduct is permitted). Our federalist system demands "respect" for the place of States in exercising their "residuary and inviolable sovereignty." *Cameron*, 595 U.S. at 277 (internal quotation marks omitted). Thus, States "clearly ha[ve] a legitimate interest in the continued enforceability of [their] own statutes." *Maine v. Taylor*, 477 U.S. 131, 137 (1986).

FDA's actions undermine the Intervenor States' enforcement interests to a startling degree. Most obviously, the 2023 REMS effectively imposes a national scheme on an issue that (except, *perhaps*, by way of unambiguous federal *legislation*) is appropriately handled on a State-by-State basis. *See Dobbs*, 597 U.S. at 302. After all, the States possess "great latitude" to protect "the lives, limb, health, comfort, and

---

[8] The Biden-era FDA argued that the 2023 REMS preempted pro-life States' restrictions on abortion. That's not only wrong, *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 267 (4th Cir. 2025) (holding that the Food and Drug Administration Amendments "fall[ ] well short of expressing a clear intention to displace the states' historic and sovereign right to protect the health and safety of their citizens"), but it also underscores why Missouri has standing, *see Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232–33 (6th Cir. 1985).

quiet of all persons." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (cleaned up). And "protect[ing] the people" within its borders is a "fundamental aspect of a State's sovereign power." *New York v. New Jersey*, 598 U.S. 218, 225 (2023); *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996).

Abortion is no exception. *Dobbs*, 597 U.S. at 302. The Supreme Court unequivocally held that "the authority to regulate abortion must be returned to the people and their elected representatives." *Dobbs*, 597 U.S. at 292. Yet FDA's actions in this space, exemplified by the 2023 REM, have displaced individual States' prerogatives on chemical abortion, effectively federalizing the subject. But setting aside the open question whether a federalized abortion policy is even permissible under the Constitution,[9] there can be little doubt that only *Congress* could establish such a policy, and, even then, it would require federal legislators to "speak clearly" given the vast political significance of the issue. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That significance provides a strong "'reason to hesitate'" before "concluding that Congress meant to confer [the] authority" to set national abortion policy to FDA. *West Virginia v. EPA*, 597 U.S. 697, 700 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

FDA's actions also materially interfere with horizontal federalism. By necessity, "[t]he sovereignty of each State … implie[s] a limitation on the sovereignty of all of its sister States." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980). "The several States are of equal dignity and authority, and the independence

---

[9] *See generally* Kevin J. Hickey & Whitney K. Novak, Congressional Research Service, LSB10787, Congressional Authority to Regulate Abortion (July 8, 2022). Scholarly debate on the question continues. *See, e.g.*, Jonathan Adler, *Could Congress Prohibit Abortion If Roe Overturned (Updated)*, The Volokh Conspiracy (June 2, 2022), https://perma.cc/R9LZ-HL64.

of one implies the exclusion of power from all others." *Brown v. Fletcher's Est.*, 210 U.S. 82, 89 (1908). After all, the Founders experienced how unfettered State sovereignty could "cut[ ] off the lifeblood of the Nation" and accordingly "discarded the Articles of Confederation and adopted a new Constitution." *Pork Producers*, 598 U.S. at 404 (Kavanaugh, J., concurring in part, dissenting in part). Under that new Constitution, each State was afforded wide latitude to establish the policies that prevail *within* its borders, a paradigm that allows "innovation and experimentation in government," promotes "increase[d] opportunity for citizen involvement in democratic processes," and, ultimately, results in governments more attuned to the "diverse needs of a heterogenous society." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

The Constitution repeatedly references the respect States owe to their sister States. For example, the Full Faith and Credit Clause imposes a "constitutional obligation to enforce the rights and duties validly created under the laws of other states." *Hughes v. Fetter*, 341 U.S. 609, 611 (1951); U.S. Const. art. IV, § 1. "That Clause prevents States from 'adopting any policy of hostility to the public Acts' of another State." *Pork Producers*, 598 U.S. at 409 (Kavanaugh, J., concurring in part, dissenting in part) (quoting *Carroll v. Lanza*, 349 U.S. 408, 413 (1955)). And the Privileges and Immunities Clause similarly bars "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Toomer v. Witsell*, 334 U.S. 385, 296 (1948); U.S. Const. art. IV, § 2. As Justice Kavanaugh has recognized, "one State's efforts" to export its regulatory preferences into "other States … raise[s] significant questions

16

under that Clause." *Pork Producers*, 598 U.S. at 409 (Kavanaugh, J., concurring in part, dissenting in part)

FDA's actions, culminating in the 2023 REMS, effectively permit New York and California doctors to export their regulatory preference regarding chemical abortions to States like Missouri, directly and fatally undermining a policy choice unambiguously enshrined in the latter's statutes. Because the 2023 REMS permits telehealth prescribing of chemical abortifacients, a New York doctor can circumvent Missouri's enactment that outlaws precisely that behavior. A California doctor who prescribes a chemical abortifacient, via a telehealth appointment, to a Missouri resident *located in Missouri at the time of the prescription* has, in practical effect, "fired a shot" across the virtual border between those two States. *Cf.* p. 14, *supra*. And FDA handed that doctor the gun.

This interference with Missouri's ability to vindicate its public policy choices *within its own territory* is a direct affront to its "sovereign interest." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). And FDA's actions are a but-for cause of the resulting harm—which extends to Missouri all it needs to satisfy the standing inquiry. After all, litigants have standing when they can point to a "concrete, particularized, and actual or imminent" harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). And "courts have recognized that States suffer a cognizable injury for purposes of constitutional standing when they allege an intrusion on their ability to enforce their own legal code, whether by way of direct interference or interference analogous to substantial pressure to change state laws." *Tennessee v. U.S.*

17

*Dep't of Educ.*, 615 F. Supp. 3d 807, 821 & n.7 (E.D. Tenn. 2022) (collecting cases). Indeed, "a State clearly has a legitimate interest in the continued enforceability of its own statutes." *Taylor*, 477 U.S. at 137. So "substantial" is a State's sovereign interest in "defend[ing] its laws" that the Supreme Court has admonished lower courts that it "should not be lightly cut off." *Cameron*, 595 U.S. at 277.

Put differently, standing separates those with a "personal stake" in a dispute from "mere bystander[s]." *Bost*, 146 S. Ct. at 519, 520. Like candidates vis-à-vis elections, States have an "obvious" interest in their legal codes' viability. *Id.* at 520. Candidates "spend untold time and resources seeking to claim the right to voice the will of the people," making their interest in fair and accurate elections "in no sense common to all members of the public." *Id.* (cleaned up). States also "spend untold time and resources" passing and enforcing state law, which is "in no sense common to all members of the public." As sovereigns, States "do not bear the sword for no reason," *see Romans* 13:4—they have been entrusted with authority to "regulate[ ] by laws" and "the power to punish the crimes committed against that law," John Locke, *The Second Treatise of Government*, Chapter 9, § 128. If a candidate is not a "mere bystander[]" to her own election, then neither is a State a "bystander" when it comes to the enforcement of its own laws. *Bost*, 146 S. Ct. at 520 (citing *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025)).

Consider Missouri's harm in a different context—proving irreparable harm for equitable relief. There, whenever "a State" is prevented from "effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S.

18

1301, 1303 (2012) (Roberts, C.J., in chambers)). The standard to demonstrate irreparable harm is "more demanding" than the one to establish a concrete injury. *See Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018). So if a State suffers irreparable harm when it cannot effectuate its duly enacted statutes, it necessarily suffers concrete harm, too.

That Missouri has standing to vindicate its sovereign interest in enforcing its own laws would not, as FDA postulates, "expand state standing to challenge any federal action that allegedly increases crime or disorder, or imposes indirect compliance costs for state law enforcement." FDA Mem. in Supp. Mot. to Dismiss ("FDA Br.") (ECF 293-1) at 12 (quoting *Washington v. FDA*, 108 F.4th 1163, 1177 (9th Cir. 2024)). That ignores the harm alleged here and the context in which FDA's actions—perhaps most notably (but not limited to) the 2023 REMS—came to be. The 2023 REMS did not *incidentally* increase telehealth abortions. *Cf. United States v. Texas*, 599 U.S. 670, 680 & n.3 (2023) (disclaiming standing when a State alleges harm from the "indirect effects" of a federal policy). Nor does allowing doctors in pro-abortion States to flout the law in pro-life States result in a mere increase in "indirect compliance costs"—recalcitrance by pro-abortion States can *fully frustrate* Missouri's efforts to vindicate its laws. *See* n. 7, *supra*.

After all, the very point of FDA's challenged actions was the abetting of chemical abortions in States where the practice is restricted or outlawed entirely. Mifepristone has one primary purpose: to induce an abortion chemically rather than surgically. The previous federal administrations that have used FDA to expand access to and the accessibility of chemical abortifacients like mifepristone have never even

19

attempted to hide the ball. As exemplified by the Biden-era 2023 REMS, FDA has made clear its "entire purpose" was to make mifepristone available via telehealth, *regardless* of contrary state laws. *Cf. Diamond Alternative Energy*, 606 U.S. at 112. When the federal government takes regulatory action that directly undermines and subverts a State's validly enacted laws, that action implicates the State's sovereign interest in establishing and enforcing its own legal code. States are the clear "objects of the challenged" regulations and have standing to contest them in court. *Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026).

Like Missouri, amici States have a clear sovereign interest in protecting pre-natal life. *Dobbs*, 597 U.S. at 301. For instance, Nebraska's Legislature long ago enacted a statute declaring "an expression of the will of the people of the State of Nebraska and the members of the Legislature to provide protection for the life of the unborn child whenever possible." Neb. Rev. Stat. § 28-325. Under that statutory principle, Nebraska has prohibited abortions after twelve weeks' gestation, *id.* § 71-6915(2), and banned chemical abortions "unless the physician who uses or prescribes" abortion pills "is physically present in the same room with the patient when the physician performs, induces, or attempts to perform or induce the abortion," *id.* § 28-335(2).

Also, like Missouri, amici States have experienced sovereign harms as a result of FDA's actions up to and including the 2023 REMS. In Nebraska, for instance, telehealth abortions have steadily increased since 2023—despite a clear prohibition on the practice. *See* Society of Family Planning, *#WeCount Report, April 2022 to June*

*2025.*[10] Other amici States with similar bans have also experienced a drastic rise in telehealth abortions. *Id.* The 2023 REMS is the only explanation for the rise in these numbers when a State otherwise prohibits the practice altogether.

The data confirms that the panoply of FDA actions challenged here do an end-run around amici States' validly enacted laws. That is a direct affront to the States' sovereignty. Such a harm is sufficiently concrete to give Missouri standing to challenge the federal government's intrusion on our federalist system.

### B.   FDA's actions impose a pocketbook injury on the Intervenor States.

The challenged FDA actions impose not only a sovereign injury on the Intervenor States, but also an economic one. "Pocketbook harm is a traditional Article III injury." *Bost*, 146 S. Ct., at 524 (Barrett, J., concurring in the judgment). "That is so not only when a law directly imposes costs on a plaintiff … but also when a plaintiff reasonably incurs costs to mitigate or avoid the substantial risk of a harm caused by a [law]." *Id.* (cleaned up).

As pled, Missouri has (and will continue to) suffer economic injury from FDA's actions. *See* State Compl. ¶¶ 261–315. Without the federal government's imprimatur, Missouri emergency rooms would experience mifepristone complications only from the occasional rogue doctor. But under the 2023 REMS, telehealth prescribed mifepristone has (and will continue) to flow regularly into Missouri because out-of-state doctors can issue such prescriptions to Missouri residents *while those residents are in*

---

[10] *See* n. 5, *supra.*

*Missouri* with virtually no consequence. And when a Missouri recipient of such a prescription suffers a complication in Missouri, the Missouri medical system must treat it. And when that Missouri patient is enrolled in Medicaid (as many thousands of Missourians are) Missouri must pay (at least in part) for the ensuing treatment. *See* State Compl. ¶¶ 290–91. It's "statistically certain" that this will happen. *All. for Hippocratic Medicine v. FDA*, 2023 WL 2913725, at *10 (5th Cir. Apr. 12, 2023). And Missouri's factual allegations bear that out. State Compl. ¶¶ 293–94, 299. Thus, Missouri's pocketbook injury is as concrete as forcing a State to enroll more people in Medicaid. *See Texas v. United States*, 50 F.4th 498, 517–20 (5th Cir. 2022).

FDA resists this conclusion, characterizing Missouri's "Medicaid-payor standing" theory as "limitless" and overly "broad" because it would establish State standing so long as a State "foot[s] the bill for at least one patient." FDA Br. at 13. But there is no lower bound on pocketbook injuries for standing purposes—the loss of a "single dollar" can suffice. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021); *see also Sprint Commc'ns Co. v. APCC Servs., Inc.,* 554 U.S. 269, 289 (2008) (litigant entitled to only a "dollar or two" of proceeds from a claim would have sufficient interest to establish standing); *id.* at 305 (Roberts, C.J., dissenting) ("Article III is worth a dollar."). FDA is right to suggest that the Supreme Court's standing jurisprudence is "not so easily brushed aside," FDA Br. at 13, but gets the import of the doctrine exactly backwards. The treasuries of the Intervenor States have taken a hit—and it is much larger than a "dollar or two." *See, e.g.*, State Compl. ¶¶ 296–99.

The FDA contends that its actions do not "require [the Intervenor States] to do anything or refrain from doing anything," so they can't have suffered an economic harm. FDA Br. at 10 (cleaned up) (quoting *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 385 (2023)). Not true. As a result of the illegal abortion drugs flowing into their borders, Intervenor States must routinely "pay for [at least] some of the emergency medical costs associated with chemical abortions for women who are on Medicaid or other public insurance." State Compl. ¶ 290.

FDA cannot dodge these harms by contending that the Intervenor States "do not prescribe or use mifepristone." FDA Br. at 10 (quoting *Hippocratic Medicine*, 602 U.S. at 385). Again, that treats the Intervenor States as "mere bystander[s]" to the erosion and deliberate flouting of their own laws. *Bost*, 146 S. Ct. at 520. Worse, it ignores that plaintiffs have standing when they suffer economic harm because of federal regulation—even when those plaintiffs aren't the directly regulated parties. In *Diamond Alternative Energy*, fuel producers who were not directly regulated by a federal regulation could nevertheless challenge it because the California regulations enabled by the federal regulation would hurt the fuel producers' ability to "make money by selling fuel." 606 U.S. at 113–14. Similarly, alfalfa farmers could challenge a rule deregulating genetically modified alfalfa when they undertook costly preventative measures to "minimize the likelihood of potential contamination." *Monsanto Co. v. Geertson Seed Farm*, 561 U.S. 139, 154–55 (2010). And parents could challenge a law that required school officials to keep students' information secret from them because the parents were the obvious "objects of the" law. *Mirabelli*, 146 S. Ct. at 803.

23

At bottom, it is impossible to deny that the Intervenor States have an economic interest at stake here. They have to pick up the tab when their women residents are harmed by a drug that the State considers too dangerous to prescribe via telehealth (or, in some instances, even use at all). *See* State Compl. ¶¶ 278, 290. Try as it might, FDA cannot deny that this sort of directly traceable pocketbook injury is a standing-conferring economic harm.

* * *

For decades, FDA has "target[ed]," *Diamond Alternative Energy*, 606 U.S. at 125, pro-life States who believe chemical abortions (at most) should be extremely rare (if not entirely illegal) and who prohibit the prescription of chemical abortifacients via telehealth. The federal government cannot now "lock[]" these States "out of court as unaffected bystanders." *Id.* FDA's actions, culminating in the 2023 REMS that has led to an explosion of telehealth mifepristone prescriptions, constitute a direct attack on the Intervenor States' duly enacted laws, striking at the very heart of their sovereignty. Not only that, but those States have suffered pocketbook harms that they otherwise would not have borne. The Intervenor States have standing to challenge FDA's illegal actions.

**CONCLUSION**

This Court should deny FDA's motion to dismiss.

Dated: April 3, 2026                       Respectfully submitted,

                                           MICHAEL T. HILGERS
                                           Attorney General

24

/s/ CODY S. BARNETT
Solicitor General

ZACHARY A. VIGLIANCO
Principal Deputy Solicitor General

Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov
zachary.viglianco@nebraska.gov

*Counsel for Amici Curiae*

On behalf of:

STEVE MARSHALL
Attorney General
State of Alabama

TIM GRIFFIN
Attorney General
State of Arkansas

CHRIS CARR
Attorney General
State of Georgia

TODD ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSEN
Attorney General
State of Montana

DREW WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

KEITH KAUTZ
Attorney General
State of Wyoming

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing brief has been served on all counsel of record by ECF.

Dated: April 3, 2026

> /s/ *Cody S. Barnett*
> CODY S. BARNETT
> *Counsel for Amici Curiae*